Jack EZON, Appellant,

v.

**FAULKNER CONSTRUCTION COMPANY et al., Appellees.**

No. 11549.

Court of Civil Appeals of Texas.

Austin.

Dec. 6, 1967.

Samuel M. Amster, Byrd, Davis, Eisenberg & Clark, Jack Eisenberg, Maloney & Black, Thomas Black, Austin, for appellant.

Phil Mockford, Austin, Crenshaw, Dupree & Milam, William R. Moss, Lubbock, Graves, Dougherty, Gee, Hearon, Moody & Garwood, Thomas G. Gee, Austin, for appellees.

HUGHES, Justice.

Faulkner Construction Company, a domestic corporation, hereinafter called "Faulkner," entered into written contracts, ·dated September 9, 1963, with Jack Ezon, appellant, for the construction of two apartment buildings in Austin, Texas, on property owned by Ezon, which apartment buildings are known as the Summit Apartments and the Nob Hill Apartments. Faulkner, not having been paid the total contract price for the construction of the Nob Hill Apartments, sued Ezon for the balance due which he alleged to be in its current petition at the time of trial as "$52,867.60 with lawful offsets * * *" or "$9,405.05."

The petition of Faulkner was sworn to as required for a suit on a sworn account. The petition also sought recovery upon quantum meruit and for interest, attorney's fees, costs and for items of damage which were subsequently abandoned.

Ezon's trial answer was a general denial. He also had filed a cross action against Faulkner, the surety on his performance bond, National Surety Corporation, and W. R. Jenkins and W. B. Hoff, architects, and Gary Pools, Inc., wherein he sought damages due to poor workmanship in constructing the two apartment buildings (Summit and Nob Hill) and to deviations from the plans and specifications as contracted, and for loss of rentals due to delay in completing the apartment buildings.

The architects, Jenkins and Hoff, answered by denying that they had breached any duty owed Ezon and by pleading that Ezon had waived "by his words and actions" any cause of action which he may have had against them. Jenkins and Hoff also filed a cross action against Ezon for $1,287.25 for fees and expenses alleged to be unpaid.

Gary Pools, Inc., filed a cross action against Ezon but its subject matter was settled prior to judgment and is not involved in this appeal.

Trial was non jury after which judgment was rendered that Ezon take nothing by his cross action and that Faulkner recover of Ezon $26,011.69, including $15,000.00 attorney's fees, all with interest, less a credit of $42.35. Jenkins and Hoff recovered the amount sought in their cross action. All costs were adjudged against Ezon.

Findings of fact and conclusions of law were filed by the trial judge.

■ Ezon's first and second points are that the trial court erred in awarding $15,-000.00 in attorney's fees. These points are sustained.

The contract between the parties did not provide for the payment of attorney's fees to either party.

Ezon took possession of both apartment buildings and has since been renting the apartments. It is not disputed but that the apartment buildings were substantially completed.

This is not a case either for application of the rules relating to suits on sworn accounts or suits in quantum meruit. Faulkner's suit, as disclosed by the pleadings and the evidence, is a suit for breach of a written contract to pay for the construction of a building in accordance with the terms of the contract.

In Van Zandt v. Fort Worth Press, 359 S.W.2d 893, Tex.Sup. (1962) the Court stated:

"Respondent's claim is not founded upon a 'sworn account or accounts' of transactions in which there were sales on one side and purchases on the other, whereby title to personal property passed from respondent to petitioners. Therefore, it is not a claim 'upon a sworn account' within the meaning of the statute."

The statute referred to was Art. 2226, Vernon's Tex.Civ.St., providing for the recovery of attorney's fees in suits on sworn accounts, the statute upon which Faulkner relies here.

■ There is nothing in the pleadings or evidence to bring this case within the definition of a sworn account as stated by the Supreme Court.

It is immaterial that the petition of Faulkner was sworn to so as to conform to the requirements for a suit on a sworn account. Morgan v. Morgan, 406 S.W.2d 347, Tex.Civ.App. San Antonio, 1966, no writ.

■ It is also of no consequence that Faulkner declared upon a quantum meruit. The applicable rule is stated in Woodard v. Southwest States, Inc., 384 S.W.2d 674, Tex.Sup., 1964, as follows:

"Recovery on an express contract and on quantum meruit are inconsistent. Where there exists a valid express contract covering the subject matter, there can be no implied contract."

■ The trial court did not indicate whether it based its judgment upon the theory of sworn account, contract or quantum meruit. If there is room for any election to be made by the Court, which we hold untenable, we believe the judgment should be upon the contract in order not to subject Ezon to the penalty of attorney's fees which he did not contract to pay and which cannot be imposed for breach of a building contract such as we have here. Latham v. Dement, 409 S.W.2d 429, Tex.Civ.App. Dallas, 1966, writ ref. n. r. e., and authorities therein cited.

Ezon's third point is that the award of $15,000.00 attorney's fees is excessive. This point becomes moot in view of our disposition of the first two points.

■ Ezon's fourth point is that the trial court erred in failing to hold that he and Faulkner had agreed that the laundry room

was to be built in accordance with a soil report and in not allowing him to recover damages for failure to so build such room, it being asserted that the overwhelming weight of the evidence called for such finding and judgment.

Ezon's fifth point, briefed with point four, is that judgment should also have been rendered against the architects Jenkins and Hoff for damages resulting from the faulty construction of the laundry room because the overwhelming weight of the evidence is that they undertook to see that Nob Hill was built in accordance with the soil report and this was not done as to the laundry room.

In May, 1962, prior to the beginning of construction of the Nob Hill, a "foundation investigation" was conducted by F. G. Bryant & Associates, Inc. "for Jenkins & Hoff, architects." A basic recommendation made in this report was that "all floor systems including basement slabs should be structurally designed free of grade with at least 6 inches of clearance."

The result of failure to comply with this recommendation, as described by Col. E. C. Adams, a soil and construction engineer, is that "the swelling motion and the swelling pressures will probably overcome the loads that are placed on it, and the building will be moved upwards, probably different amounts in different locations, to cause damage."

This soil report was conducted at the suggestion of Jenkins & Hoff and Hoff agrees that it was his firm's duty to see that it was complied with. It was conducted at Ezon's expense in the amount of $1,-408.00.

In September and October of 1966, Col. Adams made a conditions survey of the Nob Hill to determine if the earlier soil report had been complied with. Findings of this survey were that most of the foundation had been supported in accordance with the report. However, in one respect the foundation was constructed on grade contrary to the report's recommendations. This was the laundry room area which Col. Adams found to be "supported directly on the soil." The walls of the laundry room area extend "upward and abutted directly on the main frame, you might say, of the other structure."

Concerning this condition the survey comments:

"It is our opinion that the cracks and movements in the structure in the immediate vicinity of the laundry room, including certain interior damage to apartments above and to the north thereof, has been brought about as follows. The laundry room and nearby vending machine recess structure are based on a soil supported slab which is subject to movement with moisture changes in the soils, and the walls of the structures are rigidly abutted at their tops to the concrete floor and framing system. This floor and framing system is in turn integral with the column and foundation pier system which supports the main superstructure and is anchored at depth by belled piers against upward movement. The aforementioned soil supported slab has moved upward from swelling action in the soil and transmitted forces through the walls sufficient to have caused minor cracking in the floor and framing system adjacent to and above the laundry room area."

The following recommendation was made:

"An indicated corrective action would be to remove at least a 3 inch section of the laundry room and vending machine recess walls at the top, and to replace this removed section with a nonrigid treatment for weatherproofing and appearance."

Walter L. Snowden, consulting engineer who prepared the May, 1962, soil report for Frank Bryant & Associates, and who appeared as a witness for Faulkner, agreed that his recommendation was not followed

in the laundry room area and "that as a result of that, the laundry room area has tilted some, and forced the walls of the laundry room area up against the second floor." His recommended correction was basically the same as that of Col. Adams.

Claude Pendley, an architect whose expert qualifications were unquestioned, testified that the reasonable and necessary cost of freeing the upper structure from the laundry room walls and repairing the cracks caused by the movement would be $500.00. This estimate was adopted by the trial judge. The trial judge also found that "the laundry room was built on the surface contrary to the soil report, but I do not find that the parties agreed or made a part of their contract that this recommendation would be complied with."

We overrule this point. We are unable to find any evidence that Faulkner knew of the soil report or that he undertook to build the apartments in accordance with it. We find no evidence that the large piers recommended in the soil report for support of the apartment buildings were recommended for support of the laundry room or that the parties agreed for or even contemplated such support. The laundry room was a small room 11' x 11' located under the apartment building proper and between the piers supporting it. The laundry room is relatively independent of the main structure although its walls are attached to the apartment building.

Ezon does not contend that the laundry room was not built by Faulkner in accordance with the plans and specifications but only that it was not built in accordance with the soil report. This report required piers for the building to be twenty six feet deep, eighteen inches in diameter and bearing 15,000 pounds per square foot. The weight of the laundry room is not shown but that it should be supported by piers of the type indicated would be unreasonable.

A structural engineer felt that the proper way to build this laundry room was on grade using a concrete slab. The fact that the building was small, was surrounded by paving and was under and protected by the apartment building were factors entering into the manner in which the laundry room was constructed.

The trial court found that the laundry room was constructed in accordance with the agreement of the parties and the plans and specifications. We find no evidence to the contrary.

■ We are also unable to find any evidence that the architects undertook to see that the laundry room was built in accordance with the soil report, or that they had any duty in this respect.

■ Ezon's sixth point is that the trial court erred in not granting him recovery against Faulkner and the architects for defective roofing on the apartment buildings since all or at least the overwhelming weight of the evidence required such judgment.

Mr. Claude Pendley, an architect, testified:

"Q Mr. Pendley, have you had an opportunity to go out again and inspect the roof on the Nob Hill that you were discussing yesterday?

A Yes, I was out there within the last three or four days. I have kind of lost track since I have been down here. I think it was three days ago.

Q Well, were you out there this morning?

A Yes, I was this morning.

Q And exactly, pinpoint exactly what portion of the room you are talking about.

A I was on the northernmost section, because this would be the area from the masonary firewall that runs through the structure from that point on north.

Q All right, sir, and in what condition did you find that roof to be in?

A A greater portion of that area of the roof has moisture under it. Moisture— I should correct that and say moisture vapor that has blistered up the roof. Now, this vapor is detrimental to the roof. I mean, as soon as very hot weather gets to this, these bubbles are going to expand in size and probably will cause leaks, if they have not caused leaks already.

Q Do you now what would be necessary to correct this situation?

A To remove that area.

Q Do you have any knowledge or any opinion as to what the reasonable cost of that would be?

A I don't have the area of it. I know that it would cost about twenty-five dollars a square to recover this area.

Q Can you estimate the area that is involved?

A Well, without looking at the drawings, I would say between fifteen and twenty squares.

Q Which, if it was twenty squares, it would be what? Five hundred dollars? Is that correct?

A That is correct."

Joe Ezon, son of Jack Ezon, who has lived in the Nob Hill since it was completed, testified that the roof on this section of the Nob Hill was leaking at the beginning of occupancy and that "we always had trouble with that section." He also testified that he had called Faulkner on numerous occasions about the roof and that Faulkner either ignored his calls or failed to correct the difficulty.

Joe Ezon also testified from personal observation that the roofs on both apartments were installed in the rain.

Mrs. Irene Turner, who has been manager of the Summit Apartments since April, 1965, testified that a portion of the roof on those apartments began leaking in April, 1965, and that, despite repeated requests, Mr. Faulkner expressly refused to do anything about it. Finally, the services of a contractor named Walt Disney were obtained and "we had to have a whole new roof put on apartment 101, both levels, and the roof repaired on 302." The cost of this repair to Ezon was $168.25 paid on May 31, 1965, to Mr. Disney, and $528.93 was paid to Central Sales Company on various occasions for repairs to the roof.

The condition of the roof as testified to by Mr. Pendley was shown to have been on February 20, 1967, about three years after the roof was installed. That the roof had only a two year warranty is shown by the evidence.

The roofing contractor testified as follows:

"Q I will ask you, Sir, with reference to applying roofs, do you ever put roofs on in the rain?

A Well, sometimes you put a shingle roof on. Sometimes you dry in what we call 'drying in.' It is nailing your first course of felt on to a wooden deck. Sometimes you do that when it is raining. In other words, if they are decking late and it starts to rain, lots of time you go out and cover it up with your felt, but you do not mop your asphalt during wet weather.

Q Is that in the roofing business just something that is not done?

A Yes, Sir. Trying to use asphalt to a wet roof is like dropping water into a frying pan of hot grease; it will not stick. It just spatters.

Q So you have never done that?

A No, Sir.

Q This was not done out on the Nob Hill?

A No, Sir.

Q It was not done on the Summit job?

A No, Sir.

Q And are you sure of that?

A Yes, Sir."

There is evidence that Faulkner or the roofing contractor answered all calls complaining about the roofs on the buildings.

The complaints at the Summit, according to Mrs. Irene Turner, the manager there, began after she came there in April of 1965. She testified as to certain repairs. Her testimony and that of Mrs. Ezon conflict. Mrs. Turner said the leaks were roof leaks and Mrs. Ezon testified that the leaks were due to blowing rain, blowing in under the walkways and soaking through the walls. She further testified that a Mr. Walt Disney waterproofed these walls.

Further, it was shown that after possession of the Summit by the Ezons, someone had placed a louver in the wall of Apartment 101, the apartment most complained about. It was uncontroverted that the louver was improperly placed with its slot open to the side rather than down, and a blowing rain would blow in.

The evidence is that there was a condensate line leak in Apartment 101, as well. This was repaired by Mr. Wattinger.

There was also another condensate leak at the Summit where a tenant had pushed water skis into a closet and moved the drain pan. Wattinger also corrected this condition.

A Mr. Walt Disney did repairs at the Summit, but he did not testify.

The leaks complained of at the Summit Apartments were in the area of Apartments 102, 202 and 302 (each being over the other) and Apartment 101. These did not appear for over a year after occupancy.

The leaks have been stopped by repairs by Mr. Walt Disney perhaps by waterproofing the wall or by mashing in the louvers. There was no evidence of any actual roof leaks.

There is no proof whatsoever as to the cause of the leaks except that the water came through the walls, the louver or the condensate line leak. The repair charges are not shown to be reasonable and necessary or due to faulty or deficient work by Mr. Drury or Mr. Faulkner.

The trial court was unable to find from a preponderance of the evidence defects in the roofing or the amount of damages sustained therefrom.

We concur in these findings. The evidence discloses other sources of water damage than defective roofing. Also, the evidence as to damage is insufficient in that the reasonableness of the charges is not shown.

We cannot say that these findings of the trial judge are so against the great weight of the evidence as to be clearly wrong and manifestly unjust. Point six is overruled.

■ Ezon's point seven is that the trial court erred in not awarding recovery against Ezon and the architects for the reasonable cost of repairing and replacing the asphalt at Nob Hill because the evidence or at least the overwhelming weight of the evidence is that it was not installed in accordance with the plans or specifications or in a workmanlike manner.

Architect Pendley made the following comments about the asphalt on the Nob Hill Apartment:

"Asphalt drive and parking area. There is more than reasonable question about the compaction of the subbase and flexible base materials. In the short period of time since the paving was done certain base failures have occurred. Item 2.04 calls for 95% maximum density as determined by proctor method. The Contractor should be able to furnish a

testing laboratory's report of a proctor method test showing that the specification was complied with. If there is no report then the specification has not been complied with because the density has not been determined by the proctor method. The same could be said for 100% maximum density of flexible base. A 100% maximum density can be assumed but not established without a test."

No proctor test was made and none was called for by the plans and specifications. However it was shown that Faulkner and his subcontractor were qualified by education and experience to determine that the specifications as to percentage of compaction were met without a proctor test.

Mr. William T. Morgan, the subcontractor who did the asphalt work, testified that Faulkner told him there was difficulty with the asphalt.

The trial court found that the asphalt at Nob Hill did fail in 1964 but that this failure was "due to some kind of soil problem."

The soil survey, made in 1962, did not show any underground water.

The evidence shows that there was some deviation from the plans and specifications in that the clearing between the surface of the pavement and subsurface plumbing was reduced. These changes were made, according to the testimony of Mr. Harold Oberg, an architect associated with Jenkins and Hoff, to allow better drainage off the asphalt paving which was necessitated by the laying of additional concrete on what is called the "south parking lot." Mr. Oberg was of the opinion that the asphalt problem was caused by wet subsoil.

When the soil survey was made in 1962, no water was encountered. It is shown, however, that prior to the time this asphalt was laid the City of Austin had a water problem in connection with work being done on adjoining Longview Street. The City installed a "french drain" which solved the problem. Installation of french drains

to control subsoil moisture is very expensive, and to have installed one would not have been consistent with the low cost theme of this construction.

There was no asphalt failure for four or five months after it was laid and not until abnormal heavy Fall rains fell.

It is also shown that the same paving requirements made at Nob Hill were made at the Summit which has had no subsoil problems and no asphalt problems.

The evidence shows that many changes in the drainage plan at Nob Hill were made by Ezon after taking possession. They included mortaring a rip rap wall, building a concrete wall to hold dirt, building flower beds and flattening the drainage grade along the sides of the building, all of which trapped water, forced it underground and beneath the asphalt and into the subsoil. When this occurs, as Mr. Pendley testified, "it (the water) can tear that asphalt up something terrible, by itself."

We have concluded that the findings of the trial court, under review here, are not without probative evidence to support them, and that they are not so against the great weight of the evidence as to be clearly wrong and manifestly unjust. We overrule point seven.

■ Ezon's point eight is that the trial court erred in denying him judgment against Faulkner and the architects for damages resulting from their failure to provide proper drainage in each apartment building because there was no evidence or at least the overwhelming weight of the evidence is that such drainage was not provided.

The specifications for each project require that the contractor "allow no low spots for water to collect in and provide good drainage of water away from buildings."

With respect to the Nob Hill, Mr. Pendley noted that such drainage "was not accomplished in two areas on east side of building" and stated that the reasonable and

necessary cost of correction would be $300.-00.

Soil Engineer Walter Snowden, who appeared as a witness for Faulkner, testified that he was on the premises right after construction in 1964, and that his opinion as to the east side of the Nob Hill was, "I don't think that there was sufficient drainage at that time, no sir."

This inspection by Mr. Snowden was made after changes were effected by Ezon, as shown post, which affected the drainage problem.

The east side of the Summit Apartments was described by Mr. Pendley as "a morass which overflows on to patio slabs." He estimated the reasonable and necessary cost of correcting this situation at $500.00. He testified that this area was "muddy and wet * * * because it was too flat to drain the water out."

A serious problem at the Summit is the fact that all the water splashing from the swimming pool and the entire courtyard area drains on to the side walk of the west side of the apartment. Mrs. Turner, manager of the Summit Apartments, stated that on days that it rains "the water stands for days on end * * * in that section." It gets as deep as "about an inch or so in the middle portion of the sidewalk." Mr. Pendley testified that the reasonable and necessary cost of providing adequate drainage in this area as required by the plans and specifications would be $5,400.00.

Faulkner at one time made efforts to provide a proper slope on this sidewalk area but Mr. Pendley found "by the use of a level, there are low spots immediately in front of the entrances to three of the apartments on that ground floor."

After completion of the apartments, Ezon made changes in the drainage plans.

On the east side of the Nob Hill, Ezon put in flower beds with metal strips, "flattening" the ground and changing the valley four feet to five out from the building that had been built there to carry off the water, and trapping water against the building and allowing it to go under it. Further, the wall, described in the record, was placed by Ezon trapping water and allowing it to go underground into the subbase below the asphalt and the building. The rip rap wall, described in the record, was mortared up. No weep holes were left to allow the water to go through. Afterwards, it would not allow water to flow through it, but trapped it and forced it underground below the laundry room and the asphalt, as testified by Pendley, Engineer Snowden and Faulkner.

There were other changes by putting boards and car stops on the asphalt which trapped water and held it on the asphalt. It was undisputed that the grades at the projects were set by instruments (transits) and not by guess.

The elevation changes at Nob Hill were dictated by Mr. Oberg or done by the Ezons after construction.

There is evidence that adequate drainage was provided on the east side of the Nob Hill as per the plans and specifications, if the Ezon changes had not been made and that if all the conditions had remained as reported, there would have been no drainage problems.

Gutters at the Summit Apartments were added to assist in drainage, without extra cost to the Ezons. As to the east side of the Summit Apartments, Mr. Pendley complained of this being a wet area.

The evidence shows that there was a flower bed wall built by the Ezons up over the south end of this area, preventing water drainage from the area and that, even so, after a heavy rain, it was only "wet" with "no water standing."

The drainage from the area around the swimming pool does go down the sidewalk to the west side of the apartment. It was planned this way.

The elevation changes at the Summit were approved by Ezon prior to their being done. The Summit walk, said not to have enough slope, was actually torn out and replaced by Mr. Faulkner at the request of Mr. Oberg. After the change, the evidence is there was sufficient drainage.

There is evidence that the standing water referred to by Mrs. Turner was more of a "damp spot" than a "puddle," just one hour after a heavy rain.

We sustain the finding of the trial court that inadequate drainage was not shown to exist. There is probative evidence supporting this finding and we do not find it to be so against the overwhelming weight of the evidence as to be clearly wrong or manifestly unjust. Point eight is overruled.

Ezon's ninth and tenth points, jointly briefed, are that the trial court erred in failing to award him damages in the form of lost rentals for the failure of Faulkner to complete the buildings on time and in failing to find the amount of lost rentals and in this connection in charging Ezon with the burden of proving the cost of operation of the apartments.

The contract for the Summit Apartments provides for completion by January 15, 1964, and the Nob Hill contract provides for completion on February 1, 1964. The Summit contract provides, "If not finished by February 1, 1964, the contractor agrees to pay the interest on the interim financing thereafter," and the Nob Hill contract contains the same provision, "If not finished by March 1, 1964."

The District Court found that Nob Hill Apartments were completed on June 4, 1964, that eight units of the Summit Apartments were completed on February 18, 1964, and that the remaining seven units of the Summit Apartments were completed on March 28, 1964.

Mrs. Ezon testified that ordinarily she collects about $2,600.00 a month from the Summit Apartments and at least $5,000.00 a month from the Nob Hill Apartments.

Mrs. Ezon also testified that since the apartments are for University students it is necessary to rent them at the beginning of semesters or otherwise it is difficult or impossible to rent them during a semester. Thus, if an apartment was not ready by February 1st or May 1st, it would likely remain unoccupied until the beginning of the next University semester. The District Court found that Faulkner was entitled to a reasonable extension of thirty days time on account of delays, which means that the Summit should have been completed by February 15th and the Nob Hill should have been completed by March 1st. This extension was allowed by the architect, over Ezon's objection, pursuant to a conference at which only Faulkner was represented by counsel.

According to the testimony of Mrs. Ezon, the rentals lost by Ezon because of the failure of Faulkner to complete the buildings in time, even taking into account the thirty-day extension granted by the architects, amount to $5,605.29 on the Summit ($7,800.00 for March, April and May less $2,194.71 collected) and $30,000.00 for the Nob Hill ($5,000.00 for March through August).

The District Court was requested to make findings with respect to Ezon's lost rentals but declined to do so because "I find no basis for determining cost of operation of the apartments and therefore no way in which a proper figure can be made as to the lost rental."

There was a liquidated damages clause in the contract reading as follows:

"Article 2. TIME OF COMPLETION

The work to be performed under the Contract shall be commenced within ten days of the date of this agreement and shall be substantially completed February 1, 1964.

(Here insert stipulation as to liquidated damages, if any.) * * *

2. If not finished by March 1, 1964, the contractor agrees to pay the interest on the interim financing—thereafter."

Nob Hill contract (Ex. Vol. IX, PX 1); Summit contract—identical except for beginning date of liquidated damages is February 1, 1964 (Ex. Vol. VIII, CPX 41).

The trial court found that Faulkner and Ezon agreed in the Nob Hill contract that after March 1, 1964, Faulkner would pay as liquidated damages the interest on the interim financing until completion, and that such damages were a reasonable forecast of just compensation for the harm caused by the delay in completion.

The trial court further found that due to delays caused by Ezon on Nob Hill, a thirty day extension of time was proper and therefore, the liquidated damages would begin on April 1, 1964.

The trial court found the same agreement as to liquidated damages on the Summit Apartments except February 15, 1964 was the beginning date for liquidated damages—interest on interim financing until completion.

The trial court further found that at completion and delivery of the last seven units of Summit, that Ezon paid Faulkner the entire contract price less the interest on the interim financing as liquidated damages for late completion, which interest was retained by Jack Ezon as liquidated damages under the contract.

The trial court found eight units of the Summit were completed, delivered to and accepted and occupied by Ezon on February 18, 1964, and that Ezon, acting through his duly authorized agent, Mrs. Jack Ezon, executed a written acceptance of those units and a release of any and all claims that he might have against Faulkner Construction Company arising out of the construction of said units, and that the remaining seven units of the Summit Apartments were completed on March 28, 1964, and such units were delivered to and accepted and occupied by Jack Ezon on that date.

The trial court granted judgment for Ezon for the interest on the interim financing as liquidated damages against Faulkner.

In the release of the first eight units of the Summit delivered to Ezon, such release being executed by his agent, Mrs. Jack Ezon, it says, " * * * your liability for eight-fifteenths of the cost of interim financing of this job ceased * * *."

Ezon accepted the interest on the interim financing when the Summit was closed.

Ezon cites no authorities to support his contention that Faulkner had the burden of proving the net rentals, merely saying that, "This burden was erroneously placed since in computing the damages the cost of operation would amount to an offset against lost rentals and the burden of proof thereon was on Faulkner."

■ The rule to be applied is stated in Vol. 17, Tex.Jur.2d, Damages, Sec. 229, p. 290 as follows:

"In order to recover for the loss of profits the plaintiff must furnish evidence from which the jury can determine the net amount of the loss with reasonable accuracy. And he should present evidence to show such items as gross amount of sales before and after the wrongful act, availability of markets and potential customers, sums spent in preparation, percentage of profits on the sales, and any other factor that would have gone into the making up of plaintiff's profits. And in order that the true net loss be determined it is necessary that evidence be presented to show those items of expense that were made unnecessary by the wrongful act, and such matter as effected a minimization of the loss."

We followed this rule in Wade v. Southwestern Bell Telephone Company, Tex.Civ. App., 352 S.W.2d 460, 92 A.L.R.2d 913, no writ, 1961.

Since Ezon does not contend that the evidence is sufficient to show what the anticipated net rentals should have been, we will not recite the evidence in this respect.

 Because it is our opinion that Ezon has failed to discharge the duty cast on him of proving the net anticipated rentals as a basis for recovery of damages for delay in completing these buildings, we hold for this reason that these points do not reflect error and hence we will not discuss the effect of the liquidated damages clause in the contract. Points nine and ten are overruled.

 Ezon's point eleven is that the trial court erred in failing to award him judgment against Faulkner and the architects for failure to install dishwashers in the Nob Hill Apartments.

No dishwashers were installed in the Nob Hill Apartments although they were installed in the Summit Apartments. The drawings for the Nob Hill Apartments show dishwashers although the original specifications for Nob Hill do not call for them. An addenda to such specifications provides that the contractor is required to furnish "only the appliances listed."

The specifications for Nob Hill contain this provision, "Where a conflict exists between standards, specifications, codes, ordinances, and plans, the most stringent requirement shall apply."

The trial court found that according to the plans, specifications and addendum, dishwashers were not to be furnished by Faulkner.

The addendum amended the original plans as well as the specifications as is shown by the following quotation from it:

"The following items hereby became effective and shall be considered a part of the original plans and specifications."

Below this paragraph was the following paragraph relating to kitchen appliances

"Add: This contractor may have the option to furnish either electric or gas kitchen appliances and will furnish only the appliances listed."

Since dishwashers were not listed in the original specifications nor in the addendum, Faulkner was not obliged to furnish them. Any inconsistency between or ambiguity in the original plans and specifications was eliminated by the addendum which amended them. Point eleven is overruled.

 Ezon's twelfth point is that the trial court erred in denying him judgment against Faulkner and the architects for damages resulting from the unworkmanlike installation of the air conditioning because all the evidence or at least the overwhelming weight of the evidence established the poor installation of the air conditioning.

Mr. M. L. Smitty, an air conditioning technician, testified that he had done work on the air conditioners such as changing compressors and condensing fan motors; that he had changed five or six compressors and he testified that in his opinion all of the compressors he had replaced "except one, was gone out from lack of refrigerant" because "the compressor lines got together and rubbed a hold in it." He stated that the reason for this was that "the copper tubing was made in a looped circle and left either partially supported or unsupported." He testified that this condition exists in both apartments.

He further testified that unless something is done about this condition "other compressors will continue to go out."

Faulkner answers this point by contending that the pleadings do not support a recovery under this point and the testimony of Mr. Smitty. The pleading complaints as to air conditioning were limited to insufficient insulation on the copper lines and leaks in condensate lines, as to which the evidence shows have been corrected.

We have examined the pleadings and do not find allegations authorizing recovery for the items testified to by Mr. Smitty. Ezon has filed two reply briefs to Faulkner's brief and has made no effort to sustain the adequacy of the pleadings to support the recovery here sought. We overrule point twelve.

Ezon's point thirteen is that the trial court erred in not awarding him judgment against Faulkner and the architects for the failure to provide a mechanical room at Nob Hill because such room is required by the drawings and all or at least the overwhelming weight of the evidence supported such a judgment.

A mechanical room of approximately 100 square feet was called for by the Nob Hill plans. It was not constructed.

The trial court found that a mechanical room was not required to be provided for the reason that a water chill water refrigeration system was not installed.

The uncontradicted testimony of Faulkner on this point is:

"Q * * * at the time that the Nob Hill Apartments and the Addenda was prepared, what option was given to the contractor therein, so far as the type of air conditioning system to use?

A The option was given to install a chill water, two pipe chill water system or individual forced air units.

Q Now, when the chill water system, would you tell us how that is set up and how it is done, and with the other, how it is done?

A Well, with a chill water system, you have what we normally call a chiller, which makes the cold water, and it is pumped to the individual apartments, and at the individual apartments, you have what is called a fan coil unit, which is a fan that blows over the cold coils, and air conditions the apartment. In the wintertime, it is just reversed; it pumps hot water through the system.

Q And what type system is in the project?

A The individual forced air system.

Q. All right, there was a mechanical room shown on the plans and specifications. What was the purpose of this mechanical room?

A The sole purpose of this mechanical room was to house the chiller.

Q All right, sir, was this mechanical room built?

A No, sir.

Q Under the plans and specifications, if you did not use the chill water system, would there have been any use for the mechanical room, other than the chill water system?

A No, sir.

Q With reference to this particular item, and even though it was not, this system was not put in, did Mr. Ezon come to see you, or Mrs. Ezon, and talk to you about this mechanical room?

A Yes, sir, they did.

Q And approximately when was that?

A I am going to say probably in March or April.

Q And who was this that talked to you about that?

A I believe it was Mr. Ezon.

Q All, right, would you just tell us, please, sir, what the nature of the conversation was, and what took place at that time?

A Well, he kept asking me if I was going to build this particular room, and I told him, no, sir, that it was a mechanical room for the single purpose of housing the chiller, and he told me that he wanted to use it for a storage room, and of course, I said, 'Well, under the Addenda, it gave the contractor the choice of

which air conditioning system that he was to use.'

I later offered to build a like amount of area adjacent to the existing laundry room, but during this conversation, he said that he didn't know whether he wanted it there, or not, and I said, 'Mr. Ezon, I have to have the decision now,' and he wouldn't give it to me, so I withdrew the offer."

Point thirteen is overruled.

■ Ezon's point fourteen is that the trial court erred in not awarding him judgment against Faulkner and the architects for damages resulting from the poor workmanship in the construction of the apartments for the reason that all the evidence or at least the overwhelming weight of the evidence showed that the apartments were not constructed in a workmanlike manner.

Faulkner replies to this point by saying it is too general. The point is quite general and does not direct us to any specific error upon which Ezon relies. Rule 418, Texas Rules of Civil Procedure. Nevertheless, we have considered the point. There is evidence of poor workmanship, and there is evidence that the apartments were built in a good and workmanlike manner.

Mr. Claude Pendley testified there was poor workmanship in carpentry, framing and blocking at the Summit, painting and installation of railings. There is also evidence of water leakage and shoddy mill work.

The architect, Mr. Oberg, testified:

"Q In your inspection of the job, Mr. Oberg, did you find that as a general rule, was there substantial conformity with this set of plans and specifications, so far as the carpentry work was concerned, the miters the nail holes, and things of this nature?

A In my opinion, yes.

Q Also, in checking the job with reference to the painting and the plumbing,

did you find the same condition to be present?

A I did.

Q At the time that you went back after submitting your punch list and reviewed it on final inspection, at that time, did you feel that the job was substantially completed according to the plans and specifications?

A I did.

Q And did you also feel that final payment was due at that time?

A Yes.

Q Did you in any way feel that there was any unsafe or dangerous condition with reference to the railings, and the manner in which they had been installed?

A No."

The evidence is that Mr. Ezon desired the apartments to be economically but soundly constructed. This record reflects that he was successful in both of his aims.

The trial court found that these buildings were completed in accordance with the plans and specifications as amended. We sustain this finding and decline to hold that it was so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. Point fourteen is overruled.

■ Ezon's last point is that, regardless of the outcome of this appeal, two thirds of the cost of the transcript should be borne by Faulkner because he had included in it many unessential documents.

Faulkner answers, in part, that the abandoned pleadings included in the transcript were relevant on the issue of reasonableness of attorney's fees which he sought.

We will consider these matters in making what we consider to be an equitable apportionment of appellate costs.

The transcript fee is $232.75. The statement of facts fee is $2,050.00. Since most

of the transcript was relevant to Faulkner's unsuccessful attempt to collect attorney's fees, we assess the entire cost of the transcript to Faulkner. Since most of the statement of facts was useful only for Ezon's unsuccessful attempt to recover on his cross action, we assess the entire cost of the statement of facts to him. All other appellate costs, we assess one half against Faulkner and one half against Ezon.

We reform the judgment of the trial court by deleting therefrom the recovery of $15,000.00 attorney's fees awarded Faulkner against Ezon. As reformed, the judgment of the trial court is affirmed.

Judgment of trial court reformed and as reformed, affirmed.